Filed 2/3/16  In re J.F. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.F., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, <br><br>         Plaintiff and Respondent, <br><br> v. <br><br> J. F., <br><br>         Defendant and Appellant. | A145408 <br><br> (Sonoma County <br> Super. Ct. No. 4285-DEP) |

**INTRODUCTION**

J.F. (mother) appeals a juvenile court judgment terminating her parental rights over her toddler daughter J.F. and freeing J.F. for adoption, contending the court erred in declining to apply the beneficial parent-child relationship exception to termination of parental rights.[1]  (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)  We conclude there was no error and affirm the judgment.

**BACKGROUND**

On September 26, 2013, the Sonoma County Human Services Department (County) obtained a warrant and removed one-month-old J.F. from her parents' home, based on allegations of domestic violence and physical abuse between mother and J.F.'s

_____

[1] All further statutory references are to the Welfare and Institutions Code.

1

presumed father, Jose T.V. (father), who lived together. J.F. was placed in foster care with her half-brother and half-sister, ages six and eight, as to whom a separate dependency proceeding already was pending.

The following day, the County filed a dependency petition under section 300, subdivisions (a), (b) and (j) alleging domestic violence, physical abuse and substance abuse, and the court subsequently ordered J.F. detained. By this time, the parents were no longer living together. Father obtained a temporary restraining order against mother which later was dissolved when the parents stipulated to a mutual stay-away order.

Thereafter, on November 27, 2013, the court declared J.F. a dependent, pursuant to an amended petition under section 300, subdivisions (b) and (j), alleging the parents have a history of domestic violence that placed J.F. at risk of serious harm, mother physically assaulted father while holding the infant and, according to father, mother disciplined the infant at least three times for crying by spanking her on the buttocks. The amended petition also alleged J.F. was at serious risk because her older maternal half-siblings had been abused or neglected and, as a result, been declared dependants of the juvenile court and placed in emergency foster care. Two reports by the County that preceded the combined jurisdiction/disposition hearing described in greater detail mother's history of domestic violence against father, general neglect of her two older children and substance abuse problems.

The court ordered reunification services for both parents and continued the case for three-month and six-month review hearings. Subsequently, another man, Jose M.C., was determined to be J.F.'s biological father and petitioned for custody of J.F., and her presumptive father, Jose T.V., was dismissed from the proceeding.[2]

---

[2] The court later denied the biological father's request to be recognized as the child's presumed father and included in the reunification plan.

# I.

## *Mother's Reunification Period*

Mother didn't successfully reunify with J.F.  At three months, she was reported as working with a parent educator and attending individual therapy, and visiting J.F. twice weekly for four hours total.  According to the County, mother sometimes needed to be more gentle with the child during visitation because in her excitement, she would pick the child up abruptly while J.F. was sleeping.  Mother expressed concern for J.F.'s well-being, including concerns J.F. was being abused by her foster parents.  She also requested more visitation, and asked for it to be unsupervised.

After six months, the County initially recommended terminating reunification services.  It reported mother was complying with her case plan and slowly making positive behavioral changes.  It reported her weekly supervised visits, two two-hour sessions, were improving; they were "happy and healthy" and she "has become less irritated in her visits and is more focused on spending quality time with [J.F.]," noting that mother was excited to see her daughter, "is very affectionate with her," and would feed J.F., change her diaper and clip her nails.  But the County reported that, among other things, mother "continues to feel her children were removed because the emergency response social worker was paid off by drug dealers and/or [father]," was angry and "very difficult to work with," and made threats (which mother said were not serious) to blow up the social services building.  Mother also threatened to take her children if the County didn't return them to her.  The County also reported concerns about J.F.'s gross motor skills and sought to assess J.F.'s development needs.

Several days before the six-month review hearing, however, the County changed its position and recommended extending reunification services despite serious concerns because mother's therapist and parent educator were reporting progress.  The County noted it was "hesitant to say [mother] has made significant progress in controlling her anger," but also noted mother "has not demonstrated anger or placed [J.F.] in danger since the Department became involved."  The court extended services for another six months, until November 20, 2014.

After roughly 10 months of services, at an interim review hearing on September 11, 2014, the County reported mother's therapist was continuing to see progress. Her visitations had increased by an additional session, and very recently had progressed to "slightly monitored" which meant she was checked on every 30 minutes rather than continuously supervised. Mother's counsel wanted more visitation for her.

Despite these steps, the proceeding took a dramatic turn approximately one month before the scheduled 12-month review hearing when, on October 16, 2014, the child's lawyer filed a petition asking the court to terminate reunification services. The reason was because reunification services had been terminated in her older children's case after mother had threatened to kill her social worker, the social worker's family, and the children's foster parents. J.F.'s lawyer asserted that this demonstrated that mother hadn't made substantial progress in resolving the domestic violence issues that had led to J.F.'s detention, and that continuing reunification services for the infant would only delay permanence for her and put her at risk of further abuse.

Before the hearing took place on that matter, the County filed its 12-month status review report and also recommended terminating services. Among other things, the County described a history of violent threats and other accusations mother had made against the social welfare personnel involved in her children's cases. At one point, she told a social worker in the other case, " 'You messed with me and you will pay.' " Another time she threatened in therapy to kill that social worker's family. She also told a parent educator she would kill for her children because she loves her children and that is what a mother does. Mother had not participated in a domestic violence program as required by her case plan. Her visitations had returned to supervised status, and she was reported as having inappropriately tried to breast-feed her daughter, who by then was a fifteen-month old toddler.

The County also reported J.F.'s foster parents were afraid of mother and felt unsafe, and were worried she would come to their home and try to take the child. During one recent visitation, mother commented, " 'They are so stupid. If I would have wanted to do something to my daughter I would have done it at the beginning. He [the foster

4

dad] doesn't know who he messed with.' " Mother used profanity in describing the foster parents, and made a derogatory remark to her daughter apparently about the foster parents ("Come on [J.F.], let's go back, because the dogs are watching us").

The County described mother as "struggl[ing]" to make necessary behavioral changes, continuing to make threats and verbalize her anger toward the County in front of J.F., and "unable to control her anger" despite continued therapy. It concluded, "the primary safety issue of anger management has not been resolved."

The hearing on the child's request to terminate reunification services took place on November 17, 2014. The court took judicial notice of the entire case file in the other proceeding, granted the child's petition, terminated reunification services, vacated the upcoming 12-month review hearing and scheduled a section 366.26 permanency hearing.

Evidence adduced at that hearing included testimony from the social worker supervisor who took over the case due to threats mother had made to her first social worker. She described the various threats mother had made, including threats made in court to kill people. She also testified about mother's failure fully to comply with her case plan, insufficient progress in managing her anger and dismissive attitude toward anger management therapy. Mother wasn't accepting responsibility for the reasons her children had been removed from her custody, which "makes it really difficult to make progress if you can't acknowledge what the safety issues are for your children." Mother wouldn't even tell the County where she lives so the County couldn't do a home visit. She also testified the therapist for mother's other children said the two older children reported that mother had hit them, never fed them, and made them take cold showers.

On the subject of visitations and parenting, she testified mother had "appropriate visitation at times" but also testified about some negative feedback mother received from her parent educator. She also testified about some concerns during visitation when mother tried to breast-feed J.F. at age 14 months, who "kind of appeared confused; not really knowing what was happening during that visit" because she hadn't regularly been nursing by that point. Mother's behavior during visitation clearly indicated that mother didn't understand J.F.'s developmental needs. Although no visitations had ended early

5

due to mother's behavior, she reported the visits were currently supervised due to concerns mother would abscond with J.F.

Mother denied having hit her daughter, denied that she'd been referred to domestic violence classes, denied withholding her home address, and testified she would feed and play with her daughter in visitations, understood her needs and thought she had the patience to safely care for J.F.

After reunification services were terminated on November 17, 2014, mother's visitations were gradually decreased from three times a week for two hours, eventually down to one hour every other week. And, a security guard was posted to monitor the visitations due to mother's history of threats and verbal aggression.

Some three months after reunification services were terminated, on February 5, 2015, J.F. was placed in a new, confidential foster home with prospective adoptive parents, a married professional couple.

## II.

### *The Section 366.26 Hearing*

The section 366.26 hearing took place on April 14, 2015, by which time J.F. was 19 months old.

The County's 366.26 report detailed mother's contacts with J.F. since her removal at age one month, much of which we have recounted. It described her prospective adoptive parents as "committed to providing [J.F.] with a permanent home," having "a close relationship with each other and a strong family and friend support system," and "healthy, happy, and stable and very committed to adopting [J.F.]." They "have a rich life, full of a variety of extracurricular activities" and "share the common value of family and enjoy spending their free time with each other and the family pets." The County reported that J.F. "is still in the transition phase of this new placement" but "is bonding well with all members of the family," "is comfortable in their presence and seeks them out when she is in need of comfort and support," and "is starting to develop a loving relationship with them."

6

The County's social worker supervisor testified, and the court qualified him as an expert. He revealed that the reason J.F. had been moved recently, in February, out of the home of the long-term foster care family with whom she'd been living for more than a year was because mother had made death threats against the foster parents.

The supervisor also reported J.F. had been living with her prospective adoptive parents for two months and was fitting in very well with them. J.F. was just starting to learn to talk, and there was no indication she had ever asked for her biological parents. She called her foster mother "Mama."

The supervisor testified that mother's visitations had tapered off due the nature of the case and not mother's conduct during the visitations themselves. He testified J.F. had never cried at the end of visitations, other than one time "when she appeared to be going there, but didn't." Furthermore, he testified that toddlers often cry for any number of reasons, including to communicate hunger, fatigue or other needs. He corroborated that visitations were moved in October 2014 to another location and guards had to be posted due to mother's threats. And he described J.F.'s need for stability at this juncture: "She's at a point in her life to where she basically needs to be able to establish permanent attachments in her development. She's forming her ability to trust in the world, to feel safe in the world, and to have a secure, permanent place in the world."

Mother testified, through an interpreter, about her visitations with J.F. She would breast-feed J.F. when she was very young until she was told to stop when "they decided not to give her breast-feeding." She would hug J.F., feed her, and change her diaper when she was young, and as her daughter grew older and learned to crawl she also would play with her. In that period, she testified J.F. was affectionate and "didn't want me to leave her alone at any time," and that she would hold J.F. on her lap and hug her. She would play ball with her daughter who was always well-behaved. Until two months ago, her daughter would talk to her during visits and call her "Mama" or "Mom," but J.F. stopped talking to her a month ago. Mother testified that at the most recent visit, the prior day, J.F. left crying and "didn't want to leave me. She did not want to leave my arms for anything." She also testified to a "drastic" change in J.F.'s demeanor since

7

moving to her new foster home, becoming less happy and talkative during visits. Mother believed J.F. was "very close" with her and thought it would be difficult for J.F. to separate from her.

At the conclusion of the hearing, the court found it was likely J.F. would be adopted and terminated mother's parental rights, as well as those of J.F.'s presumed father, Jose T.V., and her biological father, Jose M.C. The court rejected mother's request to apply the beneficial parent-child relationship exception, which both the County and J.F.'s counsel opposed. The court ruled that the evidence was insufficient to apply the exception, and "[i]n fact, the evidence relating to mother's conduct during the foster-care situation, including the situation resulting in [J.F.] having to be removed from the foster home because of threats made to the foster parents, clearly shows that such a relationship has not been beneficial."

This appeal followed.

## DISCUSSION

Mother's sole contention is that the trial court erred in terminating her parental rights because the beneficial parent-child relationship exception under section 366.26 applied. Under subdivision (c)(1) of that statute, the court is required to terminate parental rights if the court finds by clear and convincing evidence that it is likely the child will be adopted, "unless either of the following applies: [¶] . . .[¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Proper application of this exception must be understood in light of the Legislature's purpose. As the Supreme Court has made clear, under California's dependency scheme, adoption is the preferred "first choice" and "the norm" at the permanency planning hearing if the child is adoptable. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) That is because adoption " 'gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more

8

stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*Ibid.*) Accordingly, "[t]he specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*) Moreover, a parent claiming an exception to adoption bears the burden of proof to show that it applies. (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.)

There appears to be little dispute between the parties as to whether mother satisfied her burden to establish the first prong of the beneficial parent-child relationship exception—namely, that she "maintained regular visitation and contact" with her daughter. (§ 366.26, subd.(c)(1)(B)(i).) Nevertheless, we do not reach that issue because the trial court did not err in concluding mother failed to meet her burden, under the second prong, to show that J.F. would benefit from continuing her relationship with mother. (§ 366.26, subd.(c)(1)(B)(i).)

The appropriate standard of review for a trial court's application of this exception is unsettled.[3] (Compare, e.g., *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*) [substantial evidence]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [abuse of discretion]; *In re J.C.* (2014) 226 Cal.App.4th 503, 530–531 [substantial evidence review as to whether beneficial parent-child relationship exists and abuse of discretion review as to whether that relationship provides a compelling reason to apply exception]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622.) However, the "practical

---

[3] We commend the parties' counsel for acknowledging this and for briefing the standard of review issue.

9

differences" between these standards are not significant. (*In re Jasmine D.*, at p. 1351.) Both standards require broad deference to the trial court. (*Ibid*.) In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the County, giving it the benefit of every reasonable inference and resolving all conflicts in support of the trial court's ruling. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Likewise, " '[t]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Jasmine D.*, at p. 1351.) Whether the trial court's ruling here is reviewed for substantial evidence and/or abuse of discretion, we find no error.

To demonstrate a beneficial parent-child relationship, it is not enough for a parent to show loving and affectionate contact with their child and an emotional bond. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Rather, a parent must show he or she " 'occup[ies] "a parental role" in the child's life.' " (*In re K.P.*, at p. 621.) The relationship must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, at p. 575.) The court must "balance[] the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of *a substantial, positive emotional attachment such that the child would be greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*., italics added.) The exception must be examined on a case-by-case basis, taking into account factors such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Id*. at p. 576.)

Here, mother points to a number of circumstances during her limited visitations with J.F. that no doubt reflect mother's love and affection toward J.F.[4]  But, at this stage of proceedings, mother's emotional bond *to J.F.* is not the issue.  (See *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)  Mother points to little evidence of *J.F.'s* subjective attachment *to mother*, and what evidence there is does not rise to the level of demonstrating she occupied a "parental role" in J.F.'s life.  (*Ibid*.)  This includes evidence that J.F. "had been talking a lot at visits and called mother "Mama" or "Mom," "was affectionate with Mother and was very close"; and that "Mother thought it would be difficult for [J.F.] to be separated from her."  She also argues that "[J.F.'s] relationship with her mother was the longest relationship she had had in her very short life."

These circumstances do not compel reversal of the trial court's ruling.  Virtually all of the cases mother cites affirm the juvenile court's determination that the parental bond was qualitatively insufficient, including many authorities that do so in similar circumstances.[5]  Mother also ignores all of the contrary evidence that more than amply

---

[4] For example, she argues her interactions with J.F. were "appropriate" and "they had an ongoing relationship."  She argues she was "on time and excited" to see J.F., "very affectionate" with her daughter, fed her, diapered her, clipped her nails when needed, was able to hold and interact with her daughter, and that "[h]er visits were happy and healthy."

[5] E.g., *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 622–623 (affirming where infant was removed from mother's custody when less than one month old, mother had not progressed beyond monitored visitation, had not improved parenting skills and failed to appreciate and meet child's needs); *In re Bailey* (2010) 189 Cal.App.4th 1308, 1315–1316 (affirming, despite evidence of frequent and loving contact during visitations, including that child was excited to see parent and called her "mommy," parent changed diapers, fed child and believed she and child had a strong parental bond; child spent no time in mother's custody, all contact took place through supervised weekly visitations, no evidence child had difficulty separating from mother at visitations or looked forward to them, and no evidence child benefitted from the visits); *In re Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 450 (affirming despite psychologist's finding of "affectionate closeness" between parent and three-year-old child, where child had spent more time in foster care than living with parent, had bonded with foster parent whom she called "Mother," and no evidence that severing mother's relationship would harm the child); *In re Zachary G.* (2000) 77 Cal.App.4th 799, 811 (affirming, despite evidence of mother's

11

supports the trial court's ruling. Among other evidence, J.F. was not upset when visitations ended. (See *In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 811.) She was transitioning smoothly into her new home, bonding with her new prospective adoptive parents after only two months, didn't ask for her biological mother, and referred to her foster mother as "Mama." (See *In re Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 450.) She had lived less than a month of her short life in her mother's actual custody.[6] (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 622–623.) There was expert opinion J.F. needed a secure, permanent home at this juncture. And, of course, there was the disturbing circumstance that weighed most heavily on the trial court: mother's death threats against J.F.'s first foster family that cost her toddler daughter the longest, most stable home she had ever known in her short life, after she had lived with that family, and presumably bonded with them, for more than year. With mother having already once disrupted a long-term, stable placement for her daughter, it was by no means unreasonable for the trial court to conclude it would not be beneficial for J.F. to maintain a relationship with mother who might again interfere with her placement with another family.

The only case mother cites that reversed a trial court's rejection of the parental benefit exception, *In re S.B.* (2008) 164 Cal.App.4th 289, involved quite different facts. There was no evidence in that case of persistent and escalating threats of violence against the social welfare network, or the child's caretakers. And the child's attachment to the

positive relationship with child and expert testimony that child had a strong bond and would suffer psychological distress if adopted, where there was contrary evidence the relationship was not a parental one and child relied on other adults to meet his needs).

[6] Mother acknowledges this but argues "the bigger factor was the duration of her relationship with her mother," which mother contends "was still the longest, positive relationship that she had," presumably meaning J.F. had contact with mother, through visitations, throughout her entire 19 months of life. But this will be true in virtually any case where an infant is detained at or near birth and therefore, if determinative, the exception would swallow the presumption in favor of adoption in such circumstances. At any rate, mother in effect is asking this court to substitute our judgment for that of the juvenile court which we cannot do.

father in that case was shown to be much deeper and qualitatively different than here: the father had been the child's primary caretaker for three years, fully complied with his case plan to address his substance abuse problems, the child became upset when visitations ended and wanted to leave with father, a social worker acknowledged the child would be harmed if parental ties were severed, there was expert opinion to the same effect, and the child expressed a desire to live with the father. (*Id.* at pp. 294–295, 298–301.) The only reason the court terminated parental rights was on the expectation the child's grandparents, with whom she was placed, would permit continued visitation. (*Id.* at pp. 298–301.) And as the County correctly notes, *S.B.* has been criticized and severely limited. (See, e.g., *In re J.C.*, *supra*, 226 Cal.App.4th at p. 530.) The same court that decided it later described it as confined to its "extraordinary facts." (*In re C.F.* (2011) 193 Cal.App.4th 549, 557–559.) This is not an extraordinary case.

## DISPOSITION

The order terminating mother's parental rights is affirmed.

13

_____
                                        STEWART, J.

We concur.


_____
KLINE, P.J.



_____
RICHMAN, J.







*In re J.F.* (A145408)